Trust Under the Will of Sigmund Neustadt, Deceased, for the Benefit of Agnes Neustadt; Agnes Neustadt, John M. Schiff, and Donald S. Stralem, Trustees, Petitioners, v. Commissioner of Internal Revenue, Respondent.

Docket No. 99935. Promulgated March 11, 1941.

*Harry Silverson, Esq.,* for the petitioners.
*Harold D. Thomas, Esq.,* for the respondent.

OPINION.

Opper: This proceeding was brought for a redetermination of a deficiency of $4,430.53 in petitioners' income tax for the year 1937.

The sole question presented is whether petitioners realized a taxable profit on the exchange in 1937 of 6 percent Paramount Pictures, Inc., sinking fund debentures due January 1, 1955, for an equal face amount of newly authorized 3¼ percent Paramount Pictures, Inc., convertible debentures due March 1, 1947. Paramount Pictures, Inc., hereinafter is sometimes referred to as the corporation.

All of the facts are stipulated and are hereby found accordingly. Petitioners during the year in question were the testamentary trustees of a trust for the benefit of Agnes Neustadt and filed their income tax return with the collector of internal revenue for the second district of New York.

On and prior to March 9, 1937, petitioners owned $125,000 par value of 6 percent sinking fund debentures of the corporation due January 1, 1955.[1] The debentures, which were of the coupon type, were dated as of January 1, 1935, and bore interest at the rate of 6 percent per annum, payable semiannually on January 1 and July 1 of each year. At the beginning of 1937 approximately $22,865,000 of such debentures were outstanding.

On or about February 18, 1937, Paramount Pictures, Inc., offered to the holders of its 6 percent sinking fund debentures to exchange $15,000,000 face amount thereof for a like amount of its newly authorized 3¼ percent convertible sinking fund debentures due March 1, 1947, and issued a printed circular to that effect. The new debentures were to be dated as of March 1, 1937, and were due March 1, 1947. They were the coupon type and bore interest at the rate of 3¼ percent

---

[1] Stipulation states "1935" but both parties on brief agree that "1955" is correct.

per annum, payable semiannually on March 1 and September 1 of each year. At the option of the holders they were convertible into fully paid nonassessable $1 par value voting common stock at $33⅓ per share, until March 1, 1942; and thereafter and until February 23, 1947, at $40 per share. In the event of conversion the new debentures turned in were to be canceled.

The obligation of the corporation to pay principal and interest on the new 3¼ percent convertible debentures ranked equally with its obligation to pay the principal and interest on the 6 percent sinking fund debentures.

The offer provided that in the event more than $15,000,000 principal amount of the outstanding 6 percent debentures were presented for exchange, the exchange would be pro rata. At the close of the taxable year there were outstanding approximately $12,000,000 of the new 3¼ percent debentures and approximately $10,000,000 of the 6 percent debentures.

The fair market value of the common stock of Paramount Pictures, Inc., on February 18, 1937, as determined by purchases and sales on the New York Stock Exchange, was approximately $26.50 per share. At no time between February 18, 1937, and the date of expiration of the offer of the exchange, March 9, 1937, did the price of the stock on the Exchange exceed that figure.

On or about March 9, 1937, petitioners accepted the offer and exchanged their $125,000 face amount 6 percent sinking fund debentures for the new 3¼ percent convertible debentures of a like face amount.

The offer and exchange of debentures in controversy herein was not a part of any other "plan of reorganization."

In their return for the calendar year in question petitioners reported no taxable gain on the exchange. Respondent determined that petitioners realized a gain of $58,672.82 on the exchange and that the portion thereof recognized under section 117 (a) of the Revenue Act of 1936 was $34,606.23.

We are confronted here with the question, said to be without precedent, whether an exchange of bonds for bonds in the same corporation, pursuant to a formal offer addressed to all bondholders similarly situated, gives rise to a gain recognized for tax purposes under section 112.

There seems to be no dispute that the formality and scope of the offer to exchange one series of corporate bonds for another, in the acceptance of which petitioners participated, is sufficient to characterize it as a "plan." Respondent places his reliance squarely upon the denial that the term "recapitalization" in the definition of reorgani-

zation furnished by the Revenue Act of 1936, section 112 (g) (1),[2] is broad enough to include the present transaction; so that he says, in effect, while petitioners' exchange was made pursuant to a plan, this was not a plan of reorganization. In that respect the case is materially narrower than *Walter H. Field*, 41 B. T. A. 183.

It is said that the capital of a corporation consists only of its stock; hence to recapitalize involves a rearrangement of the capital stock; and hence a plan envisaging only a rearrangement of the bonded indebtedness can not be a recapitalization. It is on that theory that respondent seeks to distinguish such cases as *Lelia S. Kirby*, 35 B. T. A. 578, and presumably *Edith M. Greenwood*, 41 B. T. A. 664. This is the hook on which the whole case hangs. For once the plan is seen to involve a "reorganization" within the meaning of section 112 (g) (1), the conclusion that this exchange is covered by the nonrecognition provisions follows without difficulty. Since "securities" include at least long term bonds,[3] section 112 (b) (3)[4] expressly authorizes nonrecognition, for it describes the case where bonds "in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for * * * securities [bonds] in such corporation * * *."

If we were concerned only with the bare language of subsection (g) (1) there would still be ample authority for ascribing to the word "recapitalization" a broader meaning than that urged by respondent.[5] But it seems to us more than this is involved. The purpose of the intricate provisions relating to reorganizations was to remove "the danger that taxable sales can be cast into the form of a reorganization,

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \*

(g) DEFINITION OF REORGANIZATION.—As used in this section and section 113—

(1) The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock; of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (D) a recapitalization, or (E) a mere change in identity, form, or place of organization, however effected.

[3] See *Lelia S. Kirby, supra;* affirmed on this issue (C. C. A., 5th Cir.), 102 Fed. (2d) 115 ; cf. *L. & E. Stirn, Inc.* v. *Commissioner* (C. C. A., 2d Cir.), 107 Fed. (2d) 390.

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \*

(b) EXCHANGES SOLELY IN KIND.—

\* \* \* \* \* \* \*

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[5] See 15 Fletcher Cyclopedia of Corporations (1938 ed.) 353 ; 2 Paul and Mertens, Law of Federal Income Taxation, 208 ; Graham and Dodd, Security Analysis, 461 ; *Stewart* v. *Utility Investing Corporation* (C. C. A., 3d Cir.), 78 Fed. (2d) 279.

while at the same time legitimate reorganizations, required in order to strengthen the financial condition of the corporation, will be permitted." [6] When we are required to deal with transfers of assets from one owner or group to another, the dangers first suggested must be recognized. Cf. *LeTulle* v. *Scofield*, 308 U. S. 415; *Commissioner* v. *Kitselman* (C. C. A., 7th Cir.), 89 Fed. (2d) 458. But here there was no transfer of assets, no change in corporate control, no possibility that a taxable sale was lurking in disguise. For the very reason that no change in ownership of the capital stock was proposed, the significance of the "continuity of interest" concept pales. And as to petitioners, their interest as bondholders continued as such.[7] In that posture of the facts the reorganization sections may thus safely be given the broadest possible scope; a conclusion we think fortified by the synonyms of a reorganization which include not only a recapitalization but, in the language immediately following, "a mere change in identity, form or place of organization, however effected." [8] This would seem to mean that the less drastic the planned rearrangement of corporate interests, the more probably Congress intended no gain or loss to be recognized.

The present plan may have been one merely of refinancing, as respondent suggests. But this is frequently the most cogent need of faltering enterprises, one which a "reorganization" is specifically designed to meet. To say that one occurs, for example, under section 77B of the Bankruptcy Act [9] but not under the revenue acts seems to assume

[6] Report of Ways and Means Committee (73d Cong., 2d sess., H. Rept. 704, p. 14) relating to the 1934 Act:

\* \* \* \* \* \* \*

"\* \* \* [The amended section] will limit reorganizations to (1) statutory mergers and consolidations; (2) transfers to a controlled corporation, 'control' being defined as an 80-percent ownership; and (3) changes in the capital structure or form of organization.

"By these limitations the committee believes that it has removed the danger that taxable sales can be cast into the form of a reorganization while at the same time, legitimate reorganizations, required in order to strengthen the financial condition of the corporation, will be permitted. Furthermore, the retention of the other reorganization provisions will prevent large losses from being established by *bondholders and* stockholders who receive securities in a newly reorganized enterprise which are *substantially the same* as their original investments." (Emphasis added.)

Report of Senate Finance Committee (73d Cong., 2d sess., S. Rept. 558, p. 17) relating to the 1934 Act:

\* \* \* \* \* \* \*

"\* \* \* If the reorganization provisions were omitted from the bill, many stockholders *and bondholders* could take large losses, although they might *retain substantially their former interests* in the enterprise. Hence, the Treasury has little or nothing to gain by the elimination of these provisions, while, on the other hand, some legitimate and desirable business readjustments would be prevented." (Emphasis added.)

[7] Although the new bonds were convertible into stock, respondent does not rest his argument on this feature and in fact takes the position, which is not without justification. that that element is of no significance under the facts shown here.

[8] See footnote 2, *supra*.

[9] See e. g. *Farlee & Co.* v. *Springfield-South Main Realty Co.* (C. C. A., 1st Cir.), 86 Fed. (2d) 931; *In re Gibson Hotels, Inc.*, 24 Fed. Supp. 859.

852

an unnecessary legislative inconsistency. If the nonrecognition sections would operate here, had the proposed refinancing included changes in the capital stock—which we understand respondent to concede—it can not be consistent to say that they are less operative merely because "desirable business readjustments" demand a less radical plan contemplating merely a rearrangement of the funded debt.

*Decision will be entered for the petitioners.*