Jeanne G. Miller v. Commissioner.
Miller v. Commissioner
Docket No. 291.
United States Tax Court
1944 Tax Ct. Memo LEXIS 332; 3 T.C.M. (CCH) 230; T.C.M. (RIA) 44077; March 14, 1944
*332 Exchange of 6 1/2 per cent gold bonds of a corporation for 5 per cent cumulative income bonds of the same corporation, pursuant to a plan, held, a reorganization as defined in sections 112 (i) (1) and 112 (b) (3) of the Revenue Act of 1932, and no gain or loss is recognized. Commissioner v. Neustadt's Trust et al., 131 Fed. (2d) 528, affirming 43 B.T.A. 848. Sidney S. Gorham, Jr., Esq., 1 N. La Salle St., Chicago, Ill., for the petitioner. Lester M. Ponder, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $295.81 in the petitioner's income tax for the year 1940. The single issue now in controversy is the taxability of a gain purported to have been derived from the sale of certain bonds by the petitioner. This question in turn depends on whether or not the bonds had been acquired in a taxable exchange. An issue relating to the deductibility of $321.15, representing expense for investment counsel services, was settled by stipulation. Findings of Fact The facts were stipulated and as so stipulated are adopted as findings of fact. The material portions *333 thereof are as follows: The petitioner is an individual residing in Evanston, Illinois. She filed her income tax return for the year 1940 with the collector of internal revenue for the first district of Illinois. On August 6, 1928 the petitioner purchased $5,000 face value of Collateral Trust Sinking Fund Six-and-One-Half-Percent Gold Bonds of the Maryland Securities Corporation, hereinafter called the company, due May 1, 1938, paying the sum of $5,050 therefor. The bonds were of the coupon type, were dated as of May 1, 1928 and bore interest at the rate of 6 1/2 per cent per annum, payable semi-annually on May 1 and November 1 each year. They were secured by a Collateral Trust Indenture dated as of May 1, 1928. The corporation promised to pay the principal and interest of the bonds. The liability for such payment to the bondholders was not limited to the security pledged under the indenture. The bonds were a part of an issue of $1,250,000 par value dated May 1, 1928, the entire amount being outstanding at the beginning of 1933. On May 1, 1931 there was a default in the payment of interest on the bonds and a Bondholders' Protective Committee for the holders of the bonds was formed *334 on or about June 30, 1931, after such default of the interest payments. The validity of the bonds was challenged in a suit styled Pauline Ballard Vidler v. Maryland Securities Corporation. The corporation proposed a certain plan called "Plan of Reorganization of Maryland Securities Corporation dated as of November 1, 1932." Under that plan the mortgage indebtedness of the corporation amounting to $1,250,000 was to be refunded and the 6 1/2 per cent gold bonds secured by the mortgage were to be exchanged, par for par, for 5 per cent cumulative income bonds in the same aggregate amount. The 5 per cent, or new, bonds were to be registered and secured by 4,497 shares (or about 90 per cent) of the common stock of the Star Publishing Company, owning and operating the Indianapolis Star and the Muncie Star. The City National Bank and Trust Company of Chicago was to be the trustee. The plan provided also for the payment of past due interest on the old bonds at the rate of 5 per cent. Mrs. Vidler was to assign and deliver to the corporation all of her 1,000 shares of preferred stock and to receive therefor $100,000 face value of the new 5 per cent bonds which were to be issued by the *335 corporation, par for par, in exchange for its old 6 1/2 per cent bonds theretofore acquired by it at a cost of approximately $28,500. The plan was duly carried out. The new bonds were secured under an indenture dated as of November 1, 1932. The indenture contained material restrictions on the rights of the corporation's stockholders. Such restrictions were not embodied in the Collateral Trust Indenture under date of May 1, 1928. The 5 per cent bonds were not convertible into capital stock of the Maryland Securities Corporation. Substantially all of the 6 1/2 per cent bonds were exchanged for the 5 per cent bonds in due course. Pursuant to the plan the petitioner exchanged her $5,000 par value Six-and-One-Half-Percent Gold Bonds for Five-Percent Collateral Trust Cumulative Income Bonds of the corporation of the same par value, $5,000, dated November 1, 1932. On October 5, 1940 the petitioner sold the bonds received by her in June, 1933 for $4,500 and claimed a long-term capital loss of $275 which the Commissioner disallowed. The Commissioner also computed a taxable gain of $1,672.92 on the sale, which sum, together with $275 loss disallowed, he added to petitioner's income. It *336 is stipulated that the petitioner is entitled to a deduction of $321.15 representing expense for investment counsel service paid by the petitioner during the taxable year. Opinion VAN FOSSAN, Judge: In its simplest form the question before us is whether or not the plan set forth in the findings of fact constituted a recapitalization as contemplated by section 112 (i) (1) (C) of the Revenue Act of 1932. [1] If so, the facts show that the exchange was made in accordance with the provisions of section 112 (b) (3) of that act, [2] and hence no gain or loss is recognized. The petitioner cites and relies upon , *337 affirming . The principle underlying the decision in that case is applicable to and controls the decision in the case at bar. There the taxpayers exchanged their 20-year 6 per cent debentures of Paramount Pictures, Inc., for a like face amount of 10-year 3 1/4 per cent convertible debentures of the same company. The court held first that the debentures were "securities," a question with which we are not concerned since the petitioner owned only bonds, an admitted "security," and exchanged them for other bonds. The court then decided that the transaction was of the very type in which the recognition of gain or loss was "held in suspense until a more substantial change in the taxpayer's original investment should occur," and was the kind of transaction which Congress meant to include in a non-recognition of gain or loss. Prior to our consideration of the Neustadt case the Commissioner had long held that an exchange of bonds for other bonds of the same corporation with no concomitant exchange of capital stock was a "refinancing" and not a recapitalization. The theory and reasoning of his position were considered thoroughly by us in the *338 Neustadt case and were not accepted. In that case we said: It is said that the capital of a corporation consists only of its stock; hence to recapitalize involves a rearrangement of the capital stock; and hence a plan envisaging only a rearrangement of the bonded indebtedness can not be a recapitalization. It is on that theory that respondent seeks to distinguish such cases as , and presumably . This is the hook on which the whole case hangs. For once the plan is seen to involve a "reorganization" within the meaning of section 112 (g) (1), the conclusion that this exchange is covered by the nonrecognition provisions follows without difficulty. Since "securities" include at least long term bonds, section 112 (b) (3) expressly authorizes nonrecognition, for it describes the case where bonds "in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for * * * securities [bonds] in such corporation * * *." If we were concerned only with the bare language of subsection (g) (1) there would still be ample *339 authority for ascribing to the word "recapitalization" a broader meaning than that urged by respondent. But it seems to us more than this is involved. The purpose of the intricate provisions relating to reorganizations was to remove "the danger that taxable sales can be cast into the form of a reorganization, while at the same time legitimate reorganizations, required in order to strengthen the financial condition of the corporation, will be permitted." When we are required to deal with transfers of assets from one owner or group to another, the dangers first suggested must be recognized. Cf. ; . But here there was no transfer of assets, no change in corporate control, no possibility that a taxable sale was lurking in disguise. For the very reason that no change in ownership of the capital stock was proposed, the significance of the "continuity of interest" concept pales. And as to petitioners, their interest as bondholders continued as such. In that posture of the facts the reorganization sections may thus safely be given the *340 broadest possible scope; a conclusion we think fortified by the synonyms of a reorganization which include not only a recapitalization but, in the language immediately following, "a mere change in identity, form or place of organization, however effected." This would seem to mean that the less drastic the planned rearrangement of corporate interests, the more probably Congress intended no gain or loss to be recognized. The respondent, although attempting to distinguish the Neustadt's Trust case, actually remains unconvinced by the logic of the case and, in effect, asks us to overrule our decision notwithstanding the affirmance of it by the Circuit Court of Appeals. This we refuse to do. The feature to which the respondent calls our attention and which he claims distinguishes the Neustadt's Trust case from the case at bar is that there the new debentures were convertible into common stock of the corporation, while here the bonds were not convertible into any other form of security. He argues that the convertibility of the debentures created a "potential" change in the capital structure of Paramount and thus may have brought the Neustadt situation within the statute. He *341 asserts that conversely the absence of such a feature excludes the situation now before us from the provisions of the statute. We see no fundamental difference in the two cases. In the Neustadt case we considered the convertibility of the bonds (see footnote 7. page 851), but it had no effect on our conclusion. We said: "As to petitioners, their interest as bondholders continued as such," and on that relationship we based our decision. We find an exact parallel in the case at bar. On the principle established in the Neustadt case, therefore, the plan, proposed and accomplished, by which the petitioner exchanged her 6 1/2 per cent gold bonds for 5 per cent cumulative income bonds constituted a recapitalization, and under the statutory definition of section 112 (i) and the provisions of section 112 (b) (3) no gain or loss was recognized in the transaction. Hence the original cost of her bonds, $5,050, is the basis of computing her loss upon the ultimate sale in 1940 of her 5 per cent cumulative income bonds. Decision will be entered under Rule 50. Footnotes
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(i) Definition of Reorganization. - As used in this section and sections 113 and 115 - (1) The term "reorganization" means * * * (C) a recapitalization.↩
2. (b) Exchanges Solely in Kind. - * * *
(3) Stock for stock on reorganization. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.↩